**In re SHANE T.**

Supreme Judicial Court of Maine.

Argued May 6, 1988.

Decided July 29, 1988.

Joseph M. O'Donnell, Goodspeed & O'Donnell, John D. Pelletier (orally), Augusta, for plaintiff.

Stephen T. Hayes (orally), Hayes & Dyer, Augusta, for defendant.

Robert J. Allen, Augusta, Guardian Ad Litem.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

On December 31, 1987, the Kennebec County Probate Court entered a judgment terminating George T.'s parental rights in his son, Shane T., and granting the adoption petition of Cheryl F., Shane's mother, and Michael F., her present husband. On his appeal to this court George contends that (1) the Probate Court erred in denying his motion for a jury trial; (2) the Probate Court abused its discretion by refusing to interview Shane in chambers or to compel Shane's examination by George's expert witness; and (3) the Probate Court's finding that George has been unable and unwilling to take responsibility for Shane was not supported by clear and convincing evidence. Rejecting those contentions, we affirm the judgment.

I.

Shane T. was born to Cheryl F. on April 12, 1979, during her marriage to George T. She was divorced from George on May 13, 1981. The divorce judgment granted Cheryl physical custody of Shane but gave alternating weekend visitation rights to the father. George's visitations and payment of child support became increasingly sporadic after July 1982, and he completely stopped paying child support after June 1983. From June 1983 until *December* 1985 George saw Shane between 6 and 12 times. George did not initiate the visits but rather saw Shane only on occasions when Shane was visiting at the home of George's sister or stepmother. George has not seen his son since December 1985.

Shane has lived with Cheryl since birth and with Cheryl's husband, Michael F.,

since 1983. Shane has a half-brother born to Cheryl and Michael in 1985, and Shane refers to Michael as his father and uses Michael's last name when asked what his own last name is.

In October 1986 Cheryl and Michael petitioned the Probate Court pursuant to 19 M.R.S.A. § 533–A (Supp.1987)[1] to terminate the parental rights of Shane's father George and to adopt Shane. Following several days of hearings the Probate Court ordered termination of George's parental rights in Shane. The Probate Court found that termination was in Shane's best interests and that George, by "years of virtual inactivity as a father," has been unwilling and unable to take responsibility within a time reasonably calculated to meet Shane's needs. Upon George's timely request the court issued supplemental findings of fact on November 4, 1987. On December 31, 1987, the court entered the judgment, now on appeal, terminating George's parental rights and granting Cheryl and Michael's petition for adoption.

II.

■ George first contends that the Probate Court's denial of his motions for a jury trial and for removal of the action to the Superior Court violated his constitutional right to a jury trial. Article I, section 20 of the Maine Constitution, in the same form today as when adopted in 1820, provides in pertinent part:

In all civil suits, and in all controversies concerning property, the parties shall have a right to a trial by jury, except in cases where it has heretofore been otherwise practiced....

Article I, section 20 guarantees parties in a civil suit the right to a jury trial unless at the time the Maine Constitution was

---

1. 19 M.R.S.A. § 533–A provides in pertinent part:

Termination of parental rights

1. Jurisdiction. A petition for termination of parental rights may be brought in Probate Court as part of an adoption petition when a child protection petition has not been initiated.

2. Except as otherwise provided by this section, a termination petition is subject to the provisions of Title 22, chapter 1071, subchapter VI [§§ 4051–4058].

adopted, the same or similar action was not tried to a jury. *See City of Portland v. DePaolo*, 531 A.2d 669, 671 (Me.1987). The case at bar is sharply distinguished from *DePaolo*, in which the City of Portland sought exclusively a money judgment as a civil penalty for violation of its anti-pornography ordinance. *Id.* In contrast, the objective of the present suit is not a money judgment, either exclusively or in any part, but rather is a coercive, injunctive-type order against the father governing his future relationship with his son. Although the specific action for termination of parental rights is a creature of recent statute, P.L. 1979, ch. 733, § 18, similar suits adjusting the relationship between parent and child were heard in equity without the intervention of a jury prior to 1820. As Justice Story explained in 1836:

> The jurisdiction of the Court of Chancery extends to the care of the person of the infant, so far as is necessary for his protection and education.... It is upon the former ground principally, that is to say, for the due protection and education of infants, that the Court interferes with the ordinary rights of parents, as guardians by nature, or by nurture, in regard to the custody and care of their children. For, though in general parents are entrusted with the custody of the persons and the education of their children; yet this is done upon the natural presumption, that the children will be properly taken care of.... But whenever this presumption is removed; and it is found, that a father ... acts in a manner injurious to their morals or interests; in every such case, the Court of Chancery will interfere, and deprive him of the custody of his children, and appoint a suitable person to act as guardian, and take care of them, and superintend their education.

2 J. Story, *Commentaries on Equity Jurisprudence* § 1341, at 574–75 (1836) (footnotes omitted). *See also* 2 J. Kent, *Commentaries on American Law* 182 (1827) ("The Court of Chancery, for just cause, may interpose and control that authority and discretion, which the father has in gen-

eral in the education and management of his child"). Justice Story observed that suits to remove children from their parents' custody "ha[ve] been acted upon in Chancery for one hundred and fifty years." 2 J. Story, *Commentaries on Equity Jurisprudence* § 1342, at 576. *See also Roussel v. State*, 274 A.2d 909, 917–23 (Me.1971). Since prior to 1820 suits of the same general nature as the present action fell within the jurisdiction of the chancery courts and were not tried to a jury, George's contention that article I, section 20 guarantees him a jury trial here is refuted by historical fact.

### III.

George contends that the probate judge abused his discretion by refusing to interview Shane in chambers or to order his examination by George's expert psychologist, pursuant to 22 M.R.S.A. § 4007 (Supp. 1987). We do not agree.

■ As to a chambers conference with a child section 4007(2) provides that:

> The court may interview a child witness in chambers, with only the guardian ad litem and counsel present, provided that the statements made are a matter of record. The court may admit and consider oral or written evidence of out-of-court statements made by a child, and may rely on that evidence to the extent of its probative value.

The court heard testimony that Shane placed considerable importance on the outcome of these proceedings and would be extremely nervous and anxious at the thought of talking directly with the judge. In addition, a psychologist employed by the guardian ad litem testified that Shane would be extremely disturbed if he thought that his statements to the judge might cause the adoption petition to fail.

■ As to court-ordered psychological examinations, section 4007(3) provides that:

> At any time during the proceeding, after a clear and convincing showing of the necessity for information that cannot

be obtained by other means, the court may order that a child ... be examined by a ... psychologist or psychiatrist.

The Probate Court found that George had not made a "clear and convincing showing of the necessity for information that cannot be obtained by other means." Unlike the situation in *In re Michael V.*, 513 A.2d 287 (Me.1986), where the only available expert testimony was that of the psychiatrist hired by the parent's adversary in the proceeding, George and his expert had access to all notes, testing data, and conclusions of the impartial psychologist ordered by the court and selected by Shane's guardian ad litem. George made no showing of any bias or predilection toward Cheryl's and Michael's position on the part of that psychologist or on the part of the guardian ad litem, whose statutory mandate was to represent only Shane's interest. *See* 19 M.R.S.A. § 533–A(3)(B). The court heard testimony from the psychologist employed by the guardian ad litem that further interviewing would cause great anxiety for Shane because of the importance he placed on his adoption by Michael. The court did not abuse its discretion by refusing either to interview Shane in chambers or to authorize an examination by another expert hired by George.

### IV.

22 M.R.S.A. § 4055(1)(B)(2) (Supp.1987), made applicable to this proceeding in the Probate Court by 19 M.R.S.A. § 533–A(2), requires, for termination of parental rights, that the court find, by clear and convincing evidence, that termination is in the best interests of the child and "[t]he parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs." The Probate Court found that those statutory requirements were met by clear and convincing evidence. That finding will stand if the evidence before the Probate Court "can rationally be read to establish as highly probable" that George has been unwilling or unable to take responsibility within a time reasonably calcu-

lated to meet Shane's needs. *In re Chesley B.*, 499 A.2d 137, 139 (Me.1985). The best interests of the child are not at issue on this appeal.

██ The Probate Court heard evidence, much of it through George's own admissions, supporting a finding by clear and convincing evidence that George had seen his son only sporadically since Shane was three years old. Although given visitation rights by the divorce judgment, George did not exercise them with any consistency or frequency. Nor has he taken affirmative steps available through the judicial system to remove any perceived impediments to maintaining a meaningful relationship with his son. George has not contributed at all to his son's support since Shane was four years old. Shane, now nine years old, saw George only some 6 to 12 times from the time he was four to the age of six and a half. Shane has not seen George at all since he was six and one half. In light of the evidence of record, the Probate Court rationally could find to a high probability that George "by his years of virtual inactivity as a father" has shown himself to be unwilling or unable to take responsibility for his son within a time reasonably calculated to meet his needs.

The entry is:

Judgment affirmed.

All concurring.